

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

UNITED STATES OF AMERICA

v.

**ANTONIO PEÑA**
**BRANDI DURST**

INDICTMENT

NO. 3:25-CR-114-CHB
18 U.S.C. § 981(a)(1)(C)
18 U.S.C. § 982(a)(1)&(b)(1)
18 U.S.C. § 1343
18 U.S.C. § 1349
18 U.S.C. § 1956(a)(1)(B)(i)
18 U.S.C. § 1956(h)
21 U.S.C. § 853(p)
28 U.S.C. § 2461(c)

The Grand Jury charges:

### COUNT 1
*(Conspiracy to Commit Wire Fraud)*

1. Beginning on a date unknown to the grand jury, but from at least in or about April 2024, and continuing through at least in or about July 2025, in the Western District of Kentucky, Jefferson County, Kentucky, and elsewhere, the defendants, **ANTONIO PEÑA** and **BRANDI DURST**, and others known and unknown to the Grand Jury, did unlawfully and willfully combine, conspire, confederate, and agree together and with each other, to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

**OBJECT OF THE CONSPIRACY**

2. It was the object of the conspiracy that the defendants, **ANTONIO PEÑA** and **BRANDI DURST**, together with others both known and unknown to the Grand Jury ("unindicted co-conspirators"), fraudulently obtained funds from senior victims by convincing their intended victims that they had already become victims of identity theft or hacking and needed to carry out

various transactions, at the direction of unindicted co-conspirators and true fraudsters, in order to protect their assets from criminals. In this elaborate ruse, the some of the unindicted co-conspirators, i.e. "callers" who communicated with the victims, would play various fictitious roles over the phone in order to gain the victims' trust and compliance, claiming to work for various entities, including: software tech support, banks, law enforcement agencies, and other government agencies. The callers would instruct victims to carry out various transactions in the interest of supposedly protecting their property from criminals, including, but not limited to, setting up new bank accounts and transferring funds to the newly created accounts; wiring money to accounts held by third parties, including into overseas accounts; withdrawing cash and providing it to unindicted co-conspirators who would pick up the funds; and, ultimately, usually after the perpetrators built trust with the victims over time, liquidating their savings and invested assets in order to purchase gold and provide it to **ANTONIO PEÑA, BRANDI DURST**, and other unindicted co-conspirators for safekeeping. The defendants and others worked in concert to organize and carry out this "gold bar scam" in cities across the United States, including in the Western District of Kentucky.

**MANNER AND MEANS**

3. The manner and means used to accomplish the objectives of the conspiracy included, among other things, the following:

4. As part of the conspiracy to carry out this "gold bar scam," **ANTONIO PEÑA, BRANDI DURST**, and other unindicted co-conspirators targeted senior victims across the United States. The fraudulent scenarios used would vary to some degree, but initial contact with a victim would typically begin by way of computer pop-up that provided a phone number to call for support. Once called by the intended victim, fraudsters began a deceitful relationship with victims where, by

posing in roles such as tech-professionals, bank representatives, and government agents, callers would build a trusting relationship with the victims. This was done by creating a sense of fear in the victims with stories of imaginary fraudsters attempting to exploit the victim's identity for monetary gain. By warning the would-be victims of future exploitation at the hands of others, along with providing the appearance of protection, over time the victims began to trust the callers. Callers often try to isolate the victims by telling them that everyone is a suspect of the attempted hackings and access and to not trust bank professionals (at the bank) and even family. As this trusting relationship developed, callers would often direct victims to carry out transactions through the traditional banking system in order to access victim funds under the guise of protecting their assets. The ultimate goal was to build enough trust to access the victim's retirement account(s) by encouraging the victim accountholders to convert funds from one or more retirement accounts into gold bars for pickup by **ANTONIO PEÑA, BRANDI DURST**, and other unindicted co-conspirators.

5. Members of the conspiracy, including defendants **ANTONIO PEÑA** and **BRANDI DURST**, would travel across the United States to pick up fraud proceeds from victims in the form of gold bars or bullion. The victims were generally told that their gold would be picked up by a Federal Reserve Agent or other government official, who would ensure its safety. **ANTONIO PEÑA, BRANDI DURST**, and others conducting gold pickups would use aliases to hide their true identities. In order to maintain trust and control the actions of the victims, callers would often provide the names (aliases) of those conducting gold pickups and instruct victims on where to meet them and what to do, which demonstrates ongoing communication and coordination between the callers and those carrying out gold pickups.

6. It was part of the conspiracy that **ANTONIO PEÑA** traveled across the United States, posing as a Federal Reserve Agent or other official to collect fraud proceeds in the form of gold bars or bullion from senior victims. This included, but was not necessarily limited to, picking up or attempting to pick up proceeds in gold from victims in: Louisville, Kentucky, in May 2024; Grand Chute, Wisconsin in, December 2024; Waukesha, Wisconsin, in March 2025, where he coordinated with **BRANDI DURST**; and Vancouver, Washington, in July 2025, where he coordinated with **BRANDI DURST** and where both **ANTONIO PEÑA** and **BRANDI DURST** were arrested as they attempted to pickup proceeds from a victim on or about July 17, 2025.

7. It was part of the conspiracy that **BRANDI DURST** traveled across the United States, posing as a Federal Reserve Agent or other official to collect fraud proceeds in the form of gold bars or bullion from senior victims. This included, but was not necessarily limited to, picking up or attempting to pick up proceeds in gold from victims in: Kansas City, Missouri, in June 2024; Waukesha, Wisconsin, in March 2025, where she coordinated with **ANTONIO PEÑA**; and Vancouver, Washington, in July 2025, where she coordinated with **ANTONIO PEÑA** and where both **ANTONIO PEÑA** and **BRANDI DURST** were arrested as they attempted to pickup proceeds from a victim on or about July 17, 2025.

8. The above-described gold bar scam involved the use of internet networks to initiate computer pop-up messages, communication via telephone between victims and callers typically stationed outside of the country, telephone communication between co-conspirators, traditional bank wires, and online gold purchases, causing numerous interstate wire communications and international wire communications.

In violation of Title 18, United States Code, Section 1349.

4

The Grand Jury further charges:

## COUNT 2
*(Money Laundering Conspiracy)*

9. Beginning on a date unknown to the grand jury, but from at least in or about April 2024, and continuing through at least in or about July 2025, in the Western District of Kentucky, Jefferson County, Kentucky, and elsewhere, the defendants **ANTONIO PEÑA** and **BRANDI DURST**, together with unindicted co-conspirators, known and unknown to the Grand Jury, did knowingly conspire to commit an offense against the United States, in that: the defendants, knowing that the property involved in financial transactions represented the proceeds of some form of unlawful activity, conducted and attempted to conduct such financial transactions, affecting interstate commerce, which in fact involved the proceeds of wire fraud (in violation of 18 U.S.C. §§ 1343, 1349), a specified unlawful activity, with the intent to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

**MANNER AND MEANS**

10. Paragraphs 1 through 8 are incorporated and realleged as if fully set forth herein.

11. The defendants, **ANTONIO PEÑA** and **BRANDI DURST**, together with unindicted co-conspirators known and unknown to the Grand Jury, conspired together to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of wire fraud by collecting and transporting fraud proceeds in the form of gold bars of bullion to be transferred through various means to be accessed by members of the conspiracy.

12. The conversion into gold served multiple purposes in this gold bar scam. Gold is seen by most, including the seniors who were the typical targets of this scam, as secure and is more familiar to them than other alternatives to fiat currency, such as cryptocurrency. Gold is, by its nature, very

5

difficult to trace, allowing it to be moved without the typical evidence left behind by standard financial transactions. Gold can be moved internationally without requiring currency exchange, can be melted down into different forms and products, and the ability to trade gold for currency to reenter the financial system without tying it back to its sources, makes it a useful tool for concealment money laundering.

13. By picking up gold bars, which could no longer be easily tied to the gold bar scam victims after being converted from traditional financial accounts into gold, and transporting the gold at the direction of unindicted co-conspirators, whether through physically transporting the gold or converting gold to currency, defendants **ANTONIO PEÑA** and **BRANDI DURST**, and other unindicted co-conspirators, attempted to, and effectively did, conceal or disguise the nature, the location, the source, the ownership, or the control of the fraud proceeds.

In violation of Title 18 United States Code, Section 1956(h).

## NOTICE OF FORFEITURE

As a result of violating Title 18, United States Code, Section 1343 and 1349, as alleged in this Indictment, the defendants, **ANTONIO PEÑA** and **BRANDI DURST**, if convicted, shall forfeit to the United States any property, real or personal, which constitutes or is derived, directly and indirectly, from proceeds traceable to such violation, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

As a result of violating Title 18, United States Code, Section 1956(h), as alleged in the Indictment, the defendants, **ANTONIO PEÑA** and **BRANDI DURST**, if convicted, shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(1), any property, real or personal, involved in such offense, and any property traceable to such property.

6

If any of the property described above, as a result of any act or omission of the defendants:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty, the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1) and Title 28, United States Code, Section 2461(c).

A TRUE BILL.

[Redacted]
FOREPERSON

_____
KYLE G. BUMGARNER
UNITED STATES ATTORNEY

KGB:CEK

UNITED STATES OF AMERICA v. **ANTONIO PEÑA** and **BRANDI DURST**

## PENALTIES

Count 1: NM 20 yrs./$250,000/both/NM 3 yrs. Supervised Release
Count 2: NM 20 yrs./$250,000/both/NM 3 yrs. Supervised Release
FORFEITURE

## NOTICE

### ANY PERSON CONVICTED OF AN OFFENSE AGAINST THE UNITED STATES SHALL BE SUBJECT TO SPECIAL ASSESSMENTS, FINES, RESTITUTION & COSTS.

SPECIAL ASSESSMENTS

18 U.S.C. § 3013 requires that a special assessment shall be imposed for each count of a conviction of offenses committed after November 11, 1984, as follows:

| | | | |
|---|---|---|---|
| Misdemeanor: | $ 25 per count/individual | Felony: | $100 per count/individual |
| | $125 per count/other | | $400 per count/other |

FINES

In addition to any of the above assessments, you may also be sentenced to pay a fine. Such fine is due immediately unless the court issues an order requiring payment by a date certain or sets out an installment schedule. You shall provide the United States Attorney's Office with a current mailing address for the entire period that any part of the fine remains unpaid, or you may be held in contempt of court. 18 U.S.C. § 3571, 3572, 3611, 3612

**Failure to pay fine as ordered may subject you to the following**:

1. **INTEREST** and **PENALTIES** as applicable by law according to last date of offense.

    For offenses occurring after December 12, 1987:

    No **INTEREST** will accrue on fines under $2,500.00.

    **INTEREST** will accrue according to the Federal Civil Post-Judgment Interest Rate in effect at the time of sentencing. This rate changes monthly. Interest accrues from the first business day following the two week period after the date a fine is imposed.

    **PENALTIES** of:

    10% of fine balance if payment more than 30 days late.

    15% of fine balance if payment more than 90 days late.

2. Recordation of a **LIEN** shall have the same force and effect as a tax lien.

3. Continuous **GARNISHMENT** may apply until your fine is paid.

18 U.S.C. §§ 3612, 3613

   If you **WILLFULLY** refuse to pay your fine, you shall be subject to an **ADDITIONAL FINE** of not more than the greater of $10,000 or twice the unpaid balance of the fine; or **IMPRISONMENT** for not more than 1 year or both. 18 U.S.C. § 3615

RESTITUTION

If you are convicted of an offense under Title 18, U.S.C., or under certain air piracy offenses, you may also be ordered to make restitution to any victim of the offense, in addition to, or in lieu of any other penalty authorized by law. 18 U.S.C. § 3663

APPEAL

If you appeal your conviction and the sentence to pay your fine is stayed pending appeal, the court shall require:

1. That you deposit the entire fine amount (or the amount due under an installment schedule during the time of your appeal) in an escrow account with the U.S. District Court Clerk, or

2. Give bond for payment thereof.

18 U.S.C. § 3572(g)

PAYMENTS

If you are ordered to make payments to the U.S. District Court Clerk's Office, certified checks or money orders should be made payable to the Clerk, U.S. District Court and delivered to the appropriate division office listed below:

| | |
|---|---|
| LOUISVILLE: | Clerk, U.S. District Court<br>106 Gene Snyder U.S. Courthouse<br>601 West Broadway<br>Louisville, KY 40202<br>502/625-3500 |
| BOWLING GREEN: | Clerk, U.S. District Court<br>120 Federal Building<br>241 East Main Street<br>Bowling Green, KY 42101<br>270/393-2500 |
| OWENSBORO: | Clerk, U.S. District Court<br>126 Federal Building<br>423 Frederica<br>Owensboro, KY 42301<br>270/689-4400 |
| PADUCAH: | Clerk, U.S. District Court<br>127 Federal Building<br>501 Broadway<br>Paducah, KY 42001<br>270/415-6400 |

If the court finds that you have the present ability to pay, an order may direct imprisonment until payment is made.